[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I INTRODUCTION
This is an action to foreclose a mortgage on real property located in Berlin, Connecticut. The property is presently utilized as a horse farm. On January 25, 2002, the plaintiff, Coughlin Realty, LLC[1]
(Coughlin), filed an amended foreclosure complaint against the defendants, Varpino LLC (Varpino), Peter Novicelli, the town of Berlin and Meadow Haven Inc.[2] The amended complaint alleges that Varpino and CT Page 6521 Novicelli are obligated to pay Coughlin the sum of $150,000 pursuant to the terms of a promissory note dated February 16, 1999. Their indebtedness is secured by a mortgage deed on the horse farm, which mortgage deed was conveyed by Varpino to Coughlin on February 26, 1999, and which was recorded on the land records of the town of Berlin on March 1, 1999. The mortgage and promissory note were executed as security for Novicelli's performance under a lease purchase agreement (LPA), pursuant to which Coughlin agreed to lease and sell to Novicelli a fifty-three acre parcel of land in East Hampton, Connecticut, which was to be operated as a gravel pit and tipping facility. The terms of the LPA provided that the mortgage was subsequent only to a first mortgage in the maximum principal amount of $135,000. The first mortgage referenced in the LPA was a January 26, 1984 mortgage held by Meadow Haven, Inc., which was assigned to Salvator Carabetta on January 27, 1984. By motion dated August 8, 2000, Coughlin substituted Carabetta as a party defendant. In addition to the Varpino mortgage, Coughlin also seeks to foreclose the interest of the Carabetta mortgage on the ground that the mortgage has been previously satisfied but not properly released from the land records.
The amended complaint further alleges that Novicelli defaulted under the terms of the mortgage and LPA in several ways, including failure to pay real property taxes due on the farm, failure to make payments to Coughlin, failure to document sales activity at the gravel pit, failure to maintain and keep records in connection with the operation of the gravel pit, and failure to pay contractors who performed work at the gravel pit, which resulted in the filing of two mechanic's liens against the property and subsequent litigation.
By answer dated December 7, 2000, Varpino and Novicelli denied all of Coughlin's claims and asserted six special defenses: (1) Novicelli made the payments alleged to be past due and owing; (2) Coughlin breached the LPA first; (3) election of remedies; (4) estoppel: (5) latches; and (6) unclean hands. By answer dated February 16, 2001, Carabetta denied the material allegations of the complaint.
On January 31, 2001, Varpino moved for summary judgment on the grounds that Coughlin had previously initiated a breach of contract suit in the judicial district of Middlesex, which seeks actual damages for the same claims being brought in the foreclosure action. Varpino argued that Coughlin could not simultaneously pursue liquidated damages in the foreclosure action and actual damages in the breach of contract action. In denying Varpino's motion, the court, Shapiro, J., held that Coughlin was not precluded from pursuing two remedies at the same time.[3]
A trial was held on September 7, 2001, September 10, 2001 and November CT Page 6522 5, 2001. The parties introduced the testimony of witnesses and a substantial number of exhibits. In January 2002, the parties filed post-trial memoranda of law and proposed findings of fact. They also agreed upon eleven stipulated findings of fact which were presented to the court.
 II FACTS
Based on the stipulation of the parties and the credible evidence presented at trial, the court finds the following relevant facts. On February 17, 1999, Coughlin and Novicelli entered into an LPA for the gravel pit as previously described. (Plaintiff's Exhibit #1) (P. Exh. #1.) The signing of the LPA was the result of arms length negotiations conducted by sophisticated individuals who were represented by their own counsel and who had an opportunity to review the LPA with counsel before signing it. (Stipulation of Fact #1.) Novicelli had been in the construction business for approximately twenty years prior to entering into the LPA and understood his obligation under the LPA to maintain accurate business records. (Transcript, Nov. 5, 2001, p. 41 et seq.)
The LPA provided that Coughlin would lease and sell to Novicelli a fifty-three acre parcel of land located in East Hampton, Connecticut, to be operated as a gravel pit and tipping facility. The LPA provided for a lease of the property for a term not to exceed ten years and for a final sale price of $700,000. (P. Exh. #1, ¶ 2.) Annual rental payments were to be paid in the minimum amount of $20,000. (Id.) This amount was to be increased by payments made to Coughlin for material sold and removed from the property plus tipping fees for material brought onto the property. (Id.) These rental payments were to be credited towards the purchase price of $700,000. (Id.)
Pursuant to paragraph 7 of the LPA, Novicelli was required, within 180 days of taking possession of the property, to stockpile an inventory of 3/4 inch processed gravel equal to 30,000 tons.[4] (Id., ¶ 7.) Pursuant to Paragraph 2 of the LPA, Novicelli was to pay the Coughlin $2.00 per ton for material removed from the property and 25 percent of all tipping fees collected on a weekly basis as part of the purchase price.[5] (Id., ¶ 2.) To account for the above payments, Novicelli was to provide Coughlin with daily reconciliation sheets showing the amount of material removed from or brought onto the property.[6] (Id., ¶ 2.)
In February of 1999, Novicelli contracted with Novicelli Inc. to operate the gravel pit. Novicelli is the owner, agent and sole unsalaried CT Page 6523 employee of Novicelli Inc. As president of Novicelli Inc., Novicelli retained two subcontractors to perform work at the gravel pit. These subcontractors were Blastech, Inc. (Blastech), which performed rock blasting during the period of March 16, 1999 through May 11, 1999, and Fay Wright Excavating, Inc. (Fay Wright), which performed rock crushing during the period of April 12, 1999 through May 7, 1999. (P. Exh. #8 and #9.) Fay Wright crushed approximately 47 tons of rock at the gravel pit. (Stipulation of Fact #2). Forty-seven tons of rock is equal to 32,900 cubic yards of crushed stone and processed gravel.[7]
(Id.).
As of October 29, 1999, neither Novicelli nor Novicelli, Inc., had paid for the services performed by the subcontractors. The cost of the services performed by Blastech was $92,937.60 and the cost of services performed by Fay Wright was $190,471.70. (Stipulation of Fact #4).
As a result of Novicelli's nonpayment, both Blastech and Fay Wright filed mechanic's liens against the gravel pit property. (P. Exhs. #8 and #9.) John Coughlin received notice of the two mechanic's liens in July of 1999, and was extremely concerned about the adverse consequences which might flow from them. (Transcript, Sept. 7, 2001, p. 27.) Up until that point, Novicelli had not informed him of any problems with respect to meeting the costs of operating the gravel pit. John Coughlin contacted Novicelli to communicate his concern about the liens and to request that the debts be paid. The parties also engaged in negotiations in an effort to resolve the debts. (Id.; Stipulation of Fact #3.) John Coughlin advised Novicelli that he wished to be informed of any payments that were made to the subcontractors. (Transcript, Sept. 7, 2001, pp. 27-28.) Novicelli, with John Coughlin's knowledge, subsequently attempted to sell the gravel pit property. (Id., p. 70.)
During the summer and fall of 1999, Novicelli continued to operate the gravel pit business and sold product for which he was paid. During this same period, however, the subcontractors were neither paid in full nor in part. (Id., p. 28.)
The LPA contains a liquidated damages clause which provides, in pertinent part. that "[i]f purchaser defaults under the terms of this Agreement, and such default is not remedied within ten (10) business days following the date on which Seller provides written notice of such default to Purchaser, then Seller may terminate this Agreement, in which event the Promissory Note provided as deposit shall become immediately due and payable as liquidated damages. . . ." (P. Exh. #1, ¶ 4(a).) Paragraph 10 further provides that, in the event of Novicelli's default, Coughlin is to personally deliver, or send by certified or registered mail, written notice of the default to Novicelli and to Novicelli's CT Page 6524 attorney. (P. Exh. #1, ¶ 10.)
On October 29, 1999, in accordance with paragraphs 4(a) and 10 of the LPA, Coughlin sent to Novicelli's attorney a notice of default with opportunity to cure. The notice stated, in part, that "my clients hereby reiterate their demand that you immediately pay in full the creditors who placed mechanics liens on the property or, in the alternative, obtain a bond for the value of the liens . . . pursuant to paragraphs 20 and 23 of the [LPA]." (P. Exh. #10.) The notice further stated that "your client's failure to obtain a bond within ten (10) business days from the receipt of this letter shall be deemed a default under the terms and conditions of the contract." (Id.)
Shortly thereafter, John Coughlin visited the gravel pit. He observed several empty dump trucks outside the gate belonging to Nutmeg Gravel 
Excavating, Inc. (Transcript, Sept. 7, 2001, p. 39-40.) Coughlin spoke to a representative of Nutmeg and learned that Nutmeg had dumped a quantity of stumps at the site, which transaction was not reported to Coughlin in the reconciliation sheets as required under the LPA. (Id, pp 39-40.) The parties have stipulated that "[o]n November 22, 23 and 24, 1999, Nutmeg Gravel Excavating, Inc. dumped a total of 25 loads of stumps on site at the gravel pit and tipping facility. Nutmeg paid a tipping fee of $3,125.00 to Peter Novicelli for dumping the 25 loads of stumps on site. Novicelli reported to the plaintiff that Nutmeg took 50 cubic yards of STUNG from the site instead of reporting that Nutmeg dumped 25 loads of stumps on site. Novicelli paid a $2.00 per cubic yard fee of $100.00 to Coughlin instead of the 25% tipping fee of $781.25 that was actually due to the plaintiff. . . . The $681.25 was eventually paid by Novicelli to the plaintiff on or about December 26, 1999. . . ." (Stipulation #5.) By letter dated December 30, 1999, Coughlin notified both Novicelli and his attorney that Novicelli was "in default when he failed to properly document and pay for material which he took onto the property." (P. Exh. #11.) In addition to noticing them about the failure to properly document tipping fees, the letter states, "your client's failure to accurately document ongoing business activity at the site is a breach of the Agreement and is considered a default under the terms of the Agreement." (Id.)
Coughlin sent a third and separate notice of default, also dated December 30, 1999, to Novicelli and to his attorney. (P. Exh. #12 #13.) In this third notice, Coughlin reiterated his demand that the mechanic's liens be removed from the property by paying the Blastech and Fay 
Wright debts or, in the alternative, by obtaining a bond. Once again, Coughlin clearly and unequivocally informed Novicelli that if he "[did] not take the necessary action to resolve this issue within 10 business days from the receipt of this letter, it shall be deemed a default under CT Page 6525 the terms and conditions of the contract." (P. Exh. #12 #13.)
Thereafter, John Coughlin's concerns and suspicions regarding Novicelli's failure to document ongoing business activities at the gravel pit deepened, and he retained the services of J.R. Russo Associates Land Surveyors Professional Engineers (J.R. Russo) to survey the site and prepare a data accumulation plan. Coughlin paid J.R. Russo $9,752.50 for its services. (Transcript, Sept. 7, 2001, p. 101; P. Exh. #15.) The parties have stipulated that "J.R Russo Associates are experts in the field of land surveying and calculating volumes of crushed stone. In their opinion, as of February 15, 2000, there were 14,794 cubic yards of crushed stone in five piles located at the gravel pit and tipping facility located in East Hampton, Connecticut, as indicated in the data accumulation plan. . . ." (Stipulation #7). As previously noted, and pursuant to the terms of the LPA, Novicelli had processed 32,900 cubic yards of material as start-up inventory at the beginning of the lease term. (Stipulation #2.) At the time of the J.R.Russo report, Novicelli had only reported to Coughlin the sale of 7,742 cubic yards of material.[8] (Transcript, September 10, 2001, pp. 17-20; P. Exh. #24.) Thus, 10,364 cubic yards of material, approximately one-third of the quantity originally processed by the subcontractors, was missing.[9] Utilizing Novicelli's price list, the unaccounted for material had a minimum approximate value of $101,049 and a maximum approximate value of $152,869.[10] (P. Exh. #24.)
Aware, now, of the substantial quantity of unaccounted for material, John Coughlin investigated further by contacting one of Novicelli's major customers, the town of East Hampton, to determine how much material the town had purchased from Novicelli. From these inquires, he learned that Novicelli had sold 1,477 cubic yards of processed material to the town between August 20, 1999 and November 3, 1999. During that period, however, Novicelli had reported to Coughlin the sale of only 1,122 cubic yards of material, or 355 cubic yards less than the amount actually sold to the town. (Stipulation #8.) The town of East Hampton utilizes a truck which holds 7 cubic yards of material. Thus, the quantity of material not reported required over 50 truckloads for its removal. (Transcript, Sept. 7, 2001, pp. 94-95.)
Novicelli did not maintain records of all sales at the gravel pit and could not account at trial for the whereabouts of the 10,364 cubic yards of material missing from the site. He relies upon a claim that he kept records to the best of his ability. (Transcript, Nov. 5, 2001, pp. 60-63 83-84.) He has not, however, paid Coughlin for the value of the missing material nor has he paid the agreed upon price of $2.00 per cubic yard for the material. CT Page 6526
The only assets of any value owned by Peter Novicelli during all times relevant in this foreclosure case were the crushed stone and processed gravel at the gravel pit, shares of stock of Novicelli Construction, Inc. and items of tangible personal property. (Stipulation #10.) As of 1999, Novicelli Construction, Inc. had no assets of any value. The equipment utilized by Novicelli at the gravel pit was neither owned by Novicelli nor by Novicelli Construction, Inc. (Transcript, Nov. 5, 2001, pp. 49-57.)
Pursuant to the LPA, Novicelli was obligated to pay all real property taxes assessed on the gravel pit property.[11] (P. Exh. #1, ¶¶ 9 
20.) He was also responsible for all costs of operating the gravel pit and agreed to hold Coughlin harmless from any claims asserted for those costs. (Id., ¶¶ 9 20.) Moreover, Novicelli made certain additional representations and warranties in the LPA which included a statement that "[t]here are no present claims, personal or otherwise, or other defenses, or offsets to the validity or enforceability of this Agreement or of Purchaser's Documents against Purchaser." (Id., ¶ 7(c) Warranties.)
As previously noted, on February 26, 1999, Novicelli and Varpino executed a $150,000 promissory note, secured by a second mortgage on the horse farm, in favor of Coughlin to secure Novicelli's performance under the LPA. The terms of the note provided that any unpaid principle balance were due and payable 10 years following the note's making. However, "[i]n the event that: (i) there shall be a Default as defined in the [LPA] beyond any applicable grace and cure period; or (ii) there shall be a Default in the performance of any other obligation of Maker under any instrument securing the repayment of the Note beyond any applicable grace and cure period . . . Then, at the option of Holder, the entire amount of principal remaining unpaid hereunder, shall immediately become due and payable." (P. Exh. #3)
The mortgage deed securing the promissory note provided that Varpino, as grantor, was required to "pay and discharge as the same became due, all taxes . . . which may be levied or assessed upon the mortgage property . . . which may be or become a lien of this mortgage or have a priority in payment to the debt secured hereby and further shall exhibit to Grantee [Coughlin] within (10) days after demand, certificates or receipts issued by the appropriate authority showing full payment of such imposition." (P. Exh. #2, ¶ 2.)
Notwithstanding the provisions of the LPA, the note, and the mortgage deed pertaining to Novicelli's duty to pay the real property taxes on the horse farm, the farm was encumbered at the time of the LPA by outstanding real property taxes owed to the town of Berlin. (P. Exh. #7.) The total CT Page 6527 taxes due as of August 31, 2001, were in the amount of $42,969.58. (P. Exh. #7.) Coughlin first learned of the delinquent taxes when he received a tax statement from the town of Berlin dated February 15, 2000, which indicated taxes due in the amount of $21,362.39. (P. Exh. #4). By letter dated March 1, 2000, Coughlin notified Novicelli, Novicelli's attorney and Varpino, that the outstanding taxes were immediately due and payable for the years 1997 through 1999. (P. Exh. #5). These taxes remain unpaid and are an encumbrance upon the property which directly affects the value of Coughlin's security. See General Statutes § 12-172.
By letter dated March 8, 2000, Novicelli informed Coughlin that he had breached the LPA by commencing the aforementioned civil actions in Middletown without first providing adequate notice and an opportunity to cure[12] Novicelli concluded his letter by stating "Finally, be advised that if all of the defaults listed in this notice of default and opportunity to cure are not remedied with (10) days following the dates set out above, then the Lease Purchase Agreement shall be automatically terminated without any further notice to you pursuant to Paragraph 4b of the Lease Purchase Agreement." (D. Novicelli Exh. N.)
Varpino is a Connecticut limited liability company. Its primary member is Gail Novicelli, the spouse of Peter Novicelli. (Transcript, Sept. 7, 2001, p. 19.) Novicelli, however, is the agent for Varpino, and is responsible for managing Varpino's business affairs, which includes the payment of property taxes on the farm. (Transcript, Nov. 5, 2001, p. 86.)
An examination of the chain of title of the farm reveals that on January 26, 1984, a land holding company known as Meadow Haven, Inc. conveyed the property to a general partnership known as Weathervane Partnership and took back a mortgage deed to secure a debt of $157,000. (Defendant Carabetta Exhibit O and P; Transcript, November 5, 2001, p. 118). Carabetta executed the Meadow Haven deed in his capacity as president of the corporation (D. Carabetta Exh. O). Thereafter, on January 27, 1984, Carabetta, again acting as president of Meadow Haven, assigned the Weathervane Mortgage deed to himself. (D. Carabetta Exh. Q.) The assignment of the mortgage was not recorded on the land records of the town of Berlin until March 30, 2000, approximately two weeks after Coughlin commenced this foreclosure action. (Id.) Carabetta executed the document in front of Michelle T. Miller, who in addition to being an employee of Carabetta's, was also a notary public. (Transcript, Nov. 5, 2001, p. 119.) Miller placed her signature on the document immediately below the statement, "In witness whereof, Meadow Haven, Inc. has hereunto caused its hand and seal to be set this 27th day of January 1984." (D. Carabetta Exh. Q.) Miller represented on the document that Carabetta personally appeared before her and signed the document on January 27, 1984. Immediately below her signature Miller states, "Notary Public, my CT Page 6528 Com. Exp 3/31/91." Miller was not called as a witness by the plaintiff to explain the reference to March 31, 1991.
On January 30, 1991, Meadow Haven, as "Grantee," and "Carabetta." as "Assignee," executed a mortgage modification agreement in favor of the Weathervane Partnership in which the mortgage maturity date was extended until January 25, 1992. The document indicates that the principal balance due on the promissory note is $134,202.26. (D. Carabetta Exh. R.) This modification was not recorded on the land records of the town of Berlin until March 30, 2000. (Id.) Once again, Miller served as witness and acknowledged Carabetta's signature. The document indicates that Miller's notary public commission expires on March 31, 1991. The modification was filed on the town of Berlin land records on March 30, 2000. (Id.)
Following passage of the January 25, 1992 expiration date, no further mortgage modifications were recorded. Notwithstanding this fact, mortgage payments continued to be made by Weathervane and, thereafter, by Varpino, after the maturity date. Carabetta accepted these payments and permitted the term to be extended indefinitely on the condition that the payments continued. (Transcript, Nov. 5, 2001, p. 126.)
The Weathervane Partnership, through warrantee deed dated July 21, 1998, conveyed to Varpino its interest in the farm subject to a number of encumbrances, one of which was a mortgage from Weathervane Partnership to Meadow Haven, Inc., in the principal amount of $134,202.26, dated January 26, 1984. . . ." (D. Carabetta Exh. S.) At the time Weathervane conveyed its interest in the farm to Varpino, Novicelli was aware that Carabetta held the first mortgage on the farm. (Transcript, Nov. 5, 2001, p. 105.) Novicelli, acting on Varpino's behalf, made mortgage payments directly to Carabetta.[13] (Transcript, Nov. 5, 2001, p. 108.) At the time of the trial, the unpaid balance of the mortgage was approximately $173,000.00. (Id.)
Varpino conveyed a second mortgage deed to Coughlin on February 26, 1999, to secure the promissory note securing Novicelli's performance under the LPA. Coughlin knew of the existence of the first mortgage held by Carabetta when he entered into the LPA with Novicelli. (Transcript, Nov. 5, 2001, pp. 109-110.)
During the course of the trial the court took judicial notice of a number of lawsuits commenced in the judicial district of Middlesex pertaining to the gravel pit. On December 17, 2000, Coughlin filed a five count complaint and application for ex parte temporary injunction, which sought to enjoin Novicelli from conducting business at the gravel pit and to restrain him from entering upon the site. Counts one through five of the complaint allege breach of contract, misrepresentation, negligent CT Page 6529 misrepresentation, conversion and unjust enrichment respectively. SeeCoughlin Realty v. Novicelli, Superior Court, judicial district of Middlesex at Middletown, Docket No. CV 90957. A hearing on the application for temporary injunction was held on January 3, 2000 and January 4, 2000. In a memorandum of decision dated January 10, 2000, the court, Shapiro. J., denied the application, holding that Coughlin had an adequate remedy at law to secure the relief sought in the complaint. Specifically, the court held that "there appear to be at least two forms of remedies at law which would be adequate. First . . . [the] plaintiff could elect to terminate the lease and seek the statutory remedy of summary process and pursue liquidated damages. . . . Second, the plaintiff may seek an attachment of the saleable material located on the site in order to forestall any possibility that [the defendant] is acting to diminish the value of the asset." Coughlin Realty v. Novicelli, Superior Court, judicial district of Middlesex at Middletown, Docket No. 90957S (January 10, 2000, Shapiro, J.). Thereafter, on March 13, 2000, Coughlin applied for and obtained a prejudgment remedy in the amount of $330,000.00. In connection with the prejudgment remedy, the court,Parker, J., ordered the attachment of all stock piled processed material at the gravel pit.[14] At present, the case has not gone to trial.
Coughlin also filed a summary process complaint against Novicelli on February 2, 2000, alleging, essentially, the same facts as contained in the December 17, 1999 complaint and application for temporary injunction. The case was tried to the court and, in a decision dated September 25, 2000, the court, O'Keefe, J., found that "the lease was breached by the defendant in the manner alleged in the plaintiff's complaint" and, accordingly, entered judgment for Coughlin. See CoughlinRealty, LLC v. Novicelli, Superior Court, judicial district of Middlesex at Middletown, Docket No. 911603 (September 25, 2000, O'Keefe, J.)
The remaining cases pertain to the mechanic liens and the parties have stipulated to the following: "Blastech, Inc. commenced a lawsuit by a Complaint dated May 3, 2000, and Fay Wright Excavation, Inc. commenced a lawsuit by a Complaint dated May 8, 2000. Both lawsuits are pending in the Middletown Court. The Blastech lawsuit is entitled Blastech, Inc. v.Coughlin Realty, L.L.C. Et Al — Docket #CV-00-0092265. In both complaints, Blastech and Fay Wright initially named both Coughlin Realty, LLC and Novicelli Construction, Inc. as defendants and claimed,inter alia, a foreclosure on their respective Mechanic's Liens which encumbered the gravel pit owned by Coughlin Realty, LLC. Subsequently, both Blastech and Fay Wright withdrew their cases as to Coughlin Realty, LLC, and prosecuted them against Novicelli Construction, Inc. only, claiming damages based on a breach of contract or unjust enrichment. On October 15, 2001, the Middletown Court, (Arena, J.), rendered judgement in the Blastech lawsuit in favor of Blastech, Inc. and CT Page 6530 against Novicelli Construction, Inc. only in the amount of $92,937.60, and on January 7, 2002, the Middletown Court, (Arena, J.), rendered judgment in the Fay Wright lawsuit in favor of Fay Wright Excavating, Inc. and against Novicelli Construction, Inc. only in the amount of $190,471.70. Judgment was not rendered in either case against Peter Novicelli who was never named as a defendant in either lawsuit." (Stipulation of Fact #6.)
In addition, the record reflects that on May 1, 2000, Coughlin commenced two additional separate actions to discharge the mechanics liens. A judgment in favor of Coughlin was entered in both matters on March 13, 2001. See Coughlin Realty v. Blastech, Superior Court, judicial district of Middlesex at Middletown, Docket No. 0092060 (March 13, 2001,Arena, J.); Coughlin Realty v. Fay Wright, Superior Court, judicial district of Middlesex at Middletown, Docket No. 0092061 (March 13, 2001,Arena, J.).
Coughlin initiated the application for temporary injunction, the damages law suit, the PJR and the summary process action to protect his interests in the property and to prevent Novicelli from continuing to remove processed material from the site without reporting and paying for it. (Transcript, Nov. 5, 2001, pp. 7-8.) Novicelli cooperated to the extent that he appeared in court and testified during the proceedings pertaining to the mechanics' liens. (Transcript, Sept. 10, 2001, p. 53.) However, Novicelli took no other steps to obtain the discharge of the liens.
Coughlin incurred substantial legal expenses in his successful efforts to discharge the liens and prevent a foreclosure of his property by the two unpaid subcontractors. Novicelli represented to John Coughlin that he would reimburse him for his legal expenses, but no payments were ever made. (Transcript, Sept. 10, 2001, p. 52.)
At trial, Coughlin presented evidence of costs and expenses, including attorney's fees, to demonstrate the reasonableness of the liquidated damages provision. (Stipulation #9.) These costs include $9,752.50 paid to J.R. Russo (P. Exh. #15); attorney fees of $7,420.00 and costs of $1,301.65 incurred in connection with this foreclosure action (P. Exh. #18, 19); attorneys' fees of $14,820.00 and costs of $200 incurred in connection with the defense of the mechanic's liens foreclosure actions (P. Exh. #18); real property taxes assessed on the gravel pit in the amount of $19,026.91 paid to the town of East Hampton (Transcript, Sept. 7, 2001, p. 101; P. Exh. #17(a)(b)(c)); $20,728 for 10,364 cubic yards of missing gravel at $2.00 per cubic yard; $101,049 representing the minimum value of the missing 10,364 cubic yards of material; lost future minimum rental payments of $20,000 per year. (P. Exh. #1); and $2,500.00 CT Page 6531 appraisal fee for horse farm appraisal.(P. Exh. #24.) The court has also taken into consideration the town of Berlin tax lien on the farm in the amount of $42,969.58, which will have priority over Coughlin's mortgage by operation of law. See General Statutes § 12-172.
A real estate appraiser qualified as an expert in the field of real estate appraisal determined the fair market value of the horse to be $312,000.00. The cost of the appraisal was $2,500. (Stipulation of Fact #11; P. Exh. #22 #23.)
In the late summer and fall of 2001, Coughlin listed the gravel pit property for sale with an asking price of $875,000.00. This price did not include the piles of processed material. There were no offers. (Transcript, Nov. 5, 2001, p. 15.)
 III DISCUSSION
A. Breach of Contract
Paragraph 2 of the LPA provides, in relevant part, that "[p]urchaser shall pay to Seller $2.00 per ton of material removed from the Property on a weekly basis. . . . Purchaser shall provide daily reconciliation sheets to Seller showing how much material has been removed from or brought to the property, as the case may be."
The court finds that Novicelli defaulted under the agreement by failing to pay Coughlin the agreed upon $2.00 per cubic yard for 355 cubic yards of material sold to the town of East Hampton; by failing to pay Coughlin the agreed upon $2.00 per cubic yard for the remaining 10,309 cubic yards of material unaccounted for; and by failing, generally, to accurately document ongoing business activity at the gravel pit. Novicelli's practice of under reporting and/or simply not reporting business activity also constitutes a breach of the implied covenant of good faith and fair dealing since it represents, in the court's opinion, an unscrupulous effort, on the part of Novicelli, to deny Coughlin payments owed him under the contract. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. . . . Conversely, [b]ad faith means more than mere negligence; it involves a dishonest purpose." (Citations omitted; internal quotation marks omitted.) Middletown Commercial AssociatesLtd. Partnership v. Middletown, 53 Conn. App. 432, 437, CT Page 6532730 A.2d 1201, cert. denied, 250 Conn. 919,738 A.2d 657 (1999). The court does not credit Novicelli's explanation as to the missing gravel.[15]
Paragraph 20 of the LPA provides, in relevant part, that the "[p]urchaser shall be responsible for all costs of operating the property during the period of possession . . . and shall save and hold the Seller harmless from any claim in connection with same."
The court finds that Novicelli defaulted under paragraph 20 of the agreement by failing to pay the $92,937.60 debt to Blastech and the $190,471.70 debt to Fay Wright, or otherwise obtain a discharge of the mechanic's liens. These debts, in the court's opinion, epitomize the "costs of operating" a gravel pit since, without the blasting and crushing services performed by these two subcontractors, Novicelli would have had no business to operate. The defendants argue, however, that "nowhere in the Agreement does Novicelli agree to post a bond in lieu of any mechanic's lien filed against the gravel pit or to pay any of its creditors if requested by the plaintiff. He is obligated to be `responsible for his debts' and to reimburse the plaintiff and otherwise hold him harmless if the plaintiff pays any of the defendant's debts." (Defendants' Brief, p. 8.) The court is unpersuaded by the defendants' argument that being responsible for costs is not the same as actually having to pay them, particularly when nonpayment resulted in mechanic's liens being placed on Coughlin's property. Paragraph 20 of the LPA provides that not only shall Novicelli be responsible for all costs associated with the operation of the gravel pit, but that he will also "save and hold the Seller harmless from any claim in connection with same." As previously noted, both Blastech and Fay Wright brought suit to foreclose their mechanic's liens and the plaintiff incurred substantial legal costs defending against those actions, costs for which he was not reimbursed by Novicelli.
Finally, the mortgage deed which secures the promissory note provides, in relevant part, that the "[g]rantor shall pay and discharge as the same become due, all taxes, assessments . . . and other impositions . . . which may be levied or assessed upon the Mortgaged Property or any part thereof, and which may be or become a lien prior to the lien of this Mortgage or have priority in payment to the debt secured hereby, and further shall exhibit to Grantee within ten (10) days after demand, certificates or receipts issued by the appropriate authority showing full payment of such imposition." (P. Exh. #2, ¶ 2.) The promissory note provides, in relevant part that "[i]n the event that . . . (ii) there shall be a Default in the performance of any other obligation of Maker under any instrument securing the repayment of the Note beyond any applicable grace and cure period . . . [t]hen, at the option of the CT Page 6533 Holder, the entire amount of principal unpaid hereunder, shall immediately become due and payable." (P. Exh. #3.) Finally, under the "purchaser's warranties" contained in paragraph 7(c) of the LPA, Novicelli represented that "[t]here are not present claims, personal or otherwise, or other defenses, or offsets to the validity or enforceability of this Agreement or of Purchaser's Documents against Purchaser." (P. Exh. #1.)
The court finds that Novicelli defaulted under the terms of the mortgage, the promissory note and the LPA by his failure to pay the real property taxes due and owing on the horse farm for the years 1997, 1998 and 1999.[16]
The defendants have asserted several defenses to this action, which the court shall consider one at a time.
B. Special Defenses
1. Election of remedies
The defendants argue that the plaintiff is barred from maintaining the present action because the plaintiff commenced the Middletown actual damages and summary process lawsuits before commencing this foreclosure action. "By bringing these two lawsuits, the plaintiff chose to claim its actual damages suffered as a result of the defendant's breaches of the Agreement and the Mortgage Deed. . . . The choice that the plaintiff did not make when he initiated these two cases was to commence a lawsuit to collect the $150,000 liquidated damages from the equity in the horse farm." (Defendants' Brief, pp. 29-30.) The defendants claim that "[i]n reliance on the plaintiff's actions and decision not to claim payment of the $150,000 liquidated damages . . . Varpino, LLC decided to postpone the payment of the past due and owing real estate taxes assessed against the horse farm." (Defendants' Brief, p. 15.)
"Under governing principles of contract law, a party who manifests the choice of one available remedy among others by bringing suit or otherwise has not barred his right to pursue any other remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation. 3 Restatement (Second) Contracts, § 378 (1981)." (Emphasis added.) (Internal quotation marks omitted.)Connecticut Light Power Co. v. Dasilva, 231 Conn. 441, 449, 650 A.2d 551
(1994). "The doctrine of election of remedies is equitable in nature and is largely a survival from the formulary procedure of the common law which necessarily demanded consistency as an end in itself; [the] doctrine does not entirely accord with the modern conception of procedure which sacrifices consistency so far as is necessary to the attainment of CT Page 6534 substantial justice; and . . . the doctrine is a harsh one not to be extended. . . . The doctrine is not intended to prevent recourse to any remedy, but to prevent double redress for a single wrong." (Citations omitted; internal quotation marks omitted.) Audubon Assoc. Ltd.Partnership v. Barclay Stubbs, 225 Conn. 804, 814, n. 6, 626 A.2d 729
(1993). The burden of pleading and proving an election of remedies is on the party asserting the claim. Grant v. Bassman, 221 Conn. 465, 473,604 A.2d 814 (1992). Finally, it is inequitable to apply the doctrine of election of remedies to benefit the breaching party. Delucia v. Burns,11 Conn. App. 439, 447, 527 A.2d 1234 (1987).
The defendants have not met their burden of proof of an election of remedies. Indeed, not only is there no credible evidence that Varpino was ready, willing or even able to pay the past due real property taxes owing on the horse farm, there is also no credible evidence that the defendants changed their positions or did anything they otherwise would not have done in reliance upon Coughlin's manifestation of an election of actual damages over liquidated damages. Indeed, at the time that Coughlin commenced the Middletown lawsuits, the property taxes owing on the horse farm were already three years past due. Thus, in the court's opinion, Varpino's non-payment of the delinquent tax bill represents a continuation of a condition, not a material change of one. Moreover, the actual damages suit has yet to go to trial. Thus, the problem of double redress for a single wrong, which the election of remedies doctrine safeguards against, is not before the court. Finally, even if the election of remedies doctrine was relevant in this instance, the court finds that it would be inequitable to apply it to the benefit of Novicelli, who is the breaching party. Delucia v. Burns, supra,11 Conn. App. 447.
 2. Whether the notices of default provided to Novicelli were ineffective and/or deficient under the LPA
The defendants claim that Coughlin failed to comply with the notice and default provisions contained in paragraphs 4(a) and 10 of the LPA. Specifically, the defendants claim that the October 29, 1999 notice of default was deficient because it was sent only to Novicelli's attorney. (Defendants' Brief, p. 23.) The defendants claim that the two December 30, 2000 notices were deficient because the plaintiff had already commenced, on December 17, 1999, the actual damages law suit in Middletown. (Defendants' Brief, pp. 23-24.) The defendants claim that the March 1, 2000 notice of breach of the mortgage deed was deficient because the plaintiff commenced the foreclosure action during the ten day cure period. (Defendants' Brief, pp. 24-25.) Finally, the defendants claim that even if the Court finds that the first three notices were properly and timely delivered, the conduct described in the notices does not CT Page 6535 constitute a breach of the LPA. Specifically, the defendants argue that "[t]he plaintiff offered evidence at trial that Novicelli breached the Agreement by failing to pay $2.00 per cubic yard fees to the plaintiff for [processed material] taken from the gravel pit by the Town of east Hampton and other identified persons. . . . However, the plaintiff never gave, nor does it claim or allege that it gave, a notice of a default and an opportunity to cure pertaining to or arising from Novicelli's failure to pay or to document [these sales.]" (Defendants' Brief, p. 25.)
Paragraph 4(a) of the LPA provides, in relevant part, that "[i]f purchaser defaults under the terms of this Agreement, and such default is not remedied within ten (10) business days following the date on which Seller provides written notice of such default to Purchaser, then Seller may terminate this Agreement, in which event the Promissory Note provided as deposit shall become immediately due and payable as liquidated damages. . . ." Paragraph 10 of the LPA provides, in relevant part, that all notices provided for under the agreement shall be sent to Novicelli and to Novicelli's attorney.
The present action was commenced by service of process upon Novicelli and upon Varpino on or about March 15, 2000, more than sixty days after the two December 30, 1999 notices and more than four months after the October 31, 1999 notice of default, well outside the ten day cure period provided for under the contract. (Sheriff's Return.) While the October 31, 1999 notice was delivered to Novicelli's attorney alone, the December 30, 1999 notices were delivered to both Novicelli and to his attorney, in compliance with paragraph 10 of the LPA.[17] The defendants claim that Coughlin failed to notify Novicelli regarding Novicelli's failure to document business activity at the gravel pit is not supported by the evidence. One of the two December 30, 1999 notices sent to Novicelli expressly states that, "your client's failure to accurately document ongoing business activity at the site is a breach of the Agreement and is considered a default under the terms of the Agreement." (P. Exh. #11.) The court finds, therefore, that Coughlin complied with notice requirement under the LPA.
3. Unclean hands, waiver, laches, and equitable estoppel
The defendants also recite several equitable principles, including unclean hands, waiver, laches, and estoppel, as defenses to this action. The defendants appear to claim these equitable defenses based on their purported reliance on the lawsuit for damages. (Defendants' Brief, p. 20.) As previously discussed, the court finds no merit to the defendants' election of remedies claim. More importantly, the court feels compelled, at this juncture, to recall for Mr. Novicelli the equitable principle that "he who seeks equity must do equity." Lesser v. Lesser, 134 Conn. 418, CT Page 6536 426, 58 A.2d 512 (1948). "Equity will not afford its aid to one who by his conduct or neglect has put the other party in a situation in which it would be inequitable to place him." Glotzer v. Keyes, 125 Conn. 227,231-32, 5 A.2d 1 (1939). "For a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with `clean hands'. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied not by way of punishment but on considerations that make for the advancement of right and justice." McCarthy v. McCarthy, 55 Conn. App. 326,335, 752 A.2d 1093 (1999). "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue." Bauer v. Waste Management of Connecticut, Inc.,239 Conn. 515, 525, 686 A.2d 481 (1996). Because the court finds that Mr. Novicelli's conduct was not fair, honest or equitable as to the controversy in issue, the court declines to employ its equitable powers in his behalf.
4. Coughlin breached the LPA before Novicelli
The defendants final claim is that Coughlin was the first to breach the LPA, before any actionable breach on the part of Novicelli or Varpino. Specifically, the defendants assert that "[t]he plaintiff breached the Agreement in several ways, including commencing the Middletown Damages Lawsuit and the Middletown Eviction Case without giving a proper and timely notice of the claimed defaults and an opportunity to cure them." (Defendants' Brief, p. 33.)
The defendants' claim, again, is not supported by the facts or by the law. First, as previously discussed, the October 31, 1999 and December 30, 1999 notices of default were adequate and effective for the purpose of commencing this foreclosure action. Second, the defendants, by their failure to pay the real property taxes owing on the horse farm, were in default of the terms of the LPA, promissory note and mortgage deed from the moment those documents were executed. Novicelli was in further default of the agreement by his failure to document and compensate Coughlin for material sold to the town of East Hampton between the dates of August 20, 1999 and November 3, 1999, several months before Coughlin commenced the first Middletown lawsuit, and by his failure to pay the operating costs of the gravel pit, resulting in the filing of two mechanic's liens on the property. Finally, Novicelli was in default of the agreement by his failure to pay Coughlin $2.00 per cubic yard for the 10,363 cubic yards of gravel missing from the property.
C. Enforcement of the Liquidated damages clause contained in LPA
CT Page 6537
Paragraph 4(a) of the LPA provides: "If purchaser defaults under the terms of this Agreement, and such default is not remedied within ten (10) business days following the date on which Seller provides written notice of such default to Purchaser, then Seller may terminate this Agreement, in which event the Promissory Note provided as deposit shall become immediately due and payable as liquidated damages and not as a penalty (it being understood that Seller's actual damages may be extremely difficult to calculate), after which neither party shall have any further obligation or liability under this Agreement." (P. Exh. #1.)
"It is settled law that a contract provision which . . . fixes liquidated damages for a breach of contract is enforceable if it satisfies certain conditions. . . . The conditions which will justify an agreement for liquidated damages are: (1) The damage which was to be expected as a result of a breach of the contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damage which, as the parties looked forward, seemed to be the presumable loss which would be sustained by the contractee in the event of a breach of the contract." St. Margaret's-McTernan School, Inc.v. Thompson, 31 Conn. App. 594, 597, 627 A.2d 449 (1993). "The party seeking to repudiate a clause that fixes a sum as damages has the burden of showing that the agreed sum is so exorbitant as to be in the nature of a penalty." Id., 598.
The court finds that the liquidated damages provision contained in the parties agreement was reasonable and justified under the facts. As previously noted, the signing of the LPA was the result of arms length negotiations conducted by sophisticated individuals who reviewed the document with counsel before signing it. (Stipulation of Fact #1.) The language of paragraph 4(a) is plain and unambiguous and manifests the parties' clear intent to liquidate damages, in advance, in the event of default. The court agrees with the parties' acknowledgment in paragraph 4 (a) of the LPA that the seller's actual damage might be extremely difficult to calculate given the complexity and duration of the business venture, and the numerous breaches which could and, ultimately, did occur. Moreover, the $150,000 stipulated in the agreement is not disproportionate to the actual damages suffered by Coughlin, which damages include: $9,752.50 paid to J.R. Russo. (P. Exh. #15); attorney fees of $7,420.00 and costs of $1,301.65 incurred in connection with this foreclosure action (P. Exh. #18, 19); attorneys' fees of $14,820.00 and costs of $200 incurred in connection with the defense of the mechanic's liens foreclosure actions (P. Exh. #18); real property taxes assessed on the gravel pit in the amount of $19,026.91 paid to the town of East Hampton (Transcript, Sept. 7, 2001, p. 101; P. Exh. #17(a)(b)(c)); CT Page 6538 $20,728 for 10,364 cubic yards of missing gravel at $2.OO per cubic yard; $101,049 to $152,869, representing the minimum and maximum retail value of the missing 10,364 cubic yards of material; lost future minimum rental payments of $20,000 per year. (P. Exh. #1); and $2,500.00 appraisal fee for the horse farm appraisal.(P. Exh. #24.) The court also takes into consideration the town of Berlin tax lien on the farm in the amount of $42,969.58, which has priority over Coughlin's mortgage by operation of law.[18] (P. Exh. #7.)
D. Coughlin's claim of priority over Meadow Haven/Carabetta Mortgage
Coughlin claims that Carabetta does not have a valid interest in an enforceable mortgage because the mortgage assignment from Meadow Haven, Inc. to Carabetta is invalid due to an invalid acknowledgment. (Plaintiff's Brief, p. 28.) Coughlin claims, essentially, that the assignment to Carabetta could not have occurred on January 27, 1984, because the notary's seal indicates that her commission expires on March 31, 1991, and, pursuant to General Statutes § 3-94c,[19] the term of a notary public is five years. Thus, Coughlin argues, "it would be impossible for her to take Mr. Carabetta's acknowledgment on January 27, 1984 and use a seal expiring March 31, 1991." (Plaintiff's Brief, p. 29.)
An examination of the document in question reveals that the notary, Michelle Miller, typed "My Com. Exp. 3/31/91" below her signature. The information actually contained on the seal, however, is illegible. (D. Carabetta Exh. Q.) The court credits Carabetta's testimony that Miller witnessed and acknowledged his signature on January 27, 1984. The court notes that Miller did not testify as to possible inconsistencies or errors, typographical or other, contained in the document.[20] The court cannot conclude, therefore, based on the evidence presented at trial, that the January 27, 1984 mortgage assignment to Carabetta was invalid due to a defective acknowledgment.[21]
Coughlin also urges the court to declare the Carabetta mortgage null and void pursuant to General Statutes § 49-13.[22] Subsection (c) of that statute, however, provides that the court may grant relief under the statute only where there is no evidence of any payment on account of the debt secured by the mortgage in the preceding six years or where the court finds that the mortgage has been satisfied but no release given as evidence of that satisfaction.
There was no evidence presented at trial that the Carabetta mortgage has been satisfied. Indeed, as previously noted, the court credits the evidence that Carabetta received mortgage payments from Varpino in 1998, 1999 and 2000. See footnote 14, supra. Section 49-13 is, therefore, in CT Page 6539 applicable to the present action and the court finds, accordingly, that the Carabetta mortgage has priority over the Coughlin mortgage.[23]
 IV CONCLUSION
The court orders a judgment of strict foreclosure. The court finds the total amount of debt in the amount of $157,420 (principle debt of $150,000 plus attorney's fees of $7,420)[24], plus costs. The fair market value of the property at the time of trial is found to be $312,000.
A bill of costs shall be filed with the clerk of the court. A law day is set on June 25, 2002, for the owner of the equity of redemption and subsequent dates in inverse order of priority.
BY THE COURT
__________________________ Peter Emmett Wiese, Judge